People v Thomas (2022 NY Slip Op 07263)

People v Thomas

2022 NY Slip Op 07263

Decided on December 22, 2022

Appellate Division, Third Department

Published by New York State Law Reporting Bureau pursuant to Judiciary Law § 431.

This opinion is uncorrected and subject to revision before publication in the Official Reports.

Decided and Entered:December 22, 2022

110396 112026
[*1]The People of the State of New York, Respondent,
v
Kevin L. Thomas, Appellant.

Calendar Date:October 20, 2022

Before:Egan Jr., J.P., Lynch, Aarons, Pritzker and McShan, JJ.

John B. Casey, Cohoes, for appellant.
Weeden A. Wetmore, District Attorney, Elmira (Nathan M. Bloom of counsel), for respondent.

Lynch, J.
Appeals (1) from a judgment of the County Court of Chemung County (Christopher P. Baker, J.), rendered April 9, 2018, convicting defendant upon his plea of guilty of the crime of criminal possession of a controlled substance in the third degree, and (2) by permission, from an order of said court, entered December 20, 2019, which denied defendant's motion pursuant to CPL 440.10 to vacate the judgment of conviction, without a hearing.
A police officer observed defendant roll through a stop sign, which led to a traffic stop lasting at least 40 minutes. A parole officer's search of defendant's vehicle during the stop turned up 2,400 packets of heroin, for which defendant was charged by indictment with two counts of criminal possession of a controlled substance in the third degree. Alleging the unlawfulness of both the prolonged traffic stop and the vehicle search, defendant moved to suppress all evidence and statements collected during the incident. A suppression hearing ensued, after which County Court denied defendant's suppression motion. Without waiving his right to appeal, defendant thereafter pleaded guilty to one count of the crime charged (see Penal Law § 220.16 [12]) in exchange for a prison term of nine years followed by three years of postrelease supervision. The court subsequently sentenced him in accord with the plea agreement. Defendant, self-represented, then moved pursuant to CPL 440.10 to vacate the judgment of conviction based on the People's purported failure to preserve video of the incident recorded on a patrol car dashboard camera (hereinafter dashcam). The court denied defendant's CPL 440.10 motion without a hearing. Defendant appeals from the judgment of conviction and, by permission, the denial of his CPL 440.10 motion.
On direct appeal, defendant contends that the police lacked justification for the prolonged traffic stop, and the parole officer acted as a conduit for police in conducting the vehicle search, rendering it unreasonable under the Fourth Amendment (see generally People v Candelaria, 63 AD2d 85, 89-91 [1st Dept 1978]). We are not persuaded.
At the suppression hearing, County Court heard testimony from Patrick Griffin and Edward Linehan, officers with the Elmira Police Department (hereinafter EPD), and James Pirozzolo, a senior parole officer. The court also received into evidence video from a body camera worn by Theron Brown, another officer with EPD, depicting the first 40 minutes of defendant's encounter with police. Such testimony and evidence revealed that, around 8:20 p.m. on September 2, 2016, Griffin was off duty and traveling on Interstate 81 through Pennsylvania toward the City of Elmira, Chemung County, when he observed defendant's distinctive vehicle, a silver Porsche Cayenne, traveling in the same direction. Aware of defendant's legal history and parole status, Griffin called Linehan, who was on duty that evening, to alert him "that this might be something for [him] to watch for" — that is, defendant [*2]was outside the geographical limit of his parole conditions and, if not approved by his parole officer, "there might be something going on."
Linehan, also familiar with defendant, waited in his patrol car near the off-ramp defendant would likely take to come into Elmira. When defendant exited the highway around 9:20 p.m., Linehan followed, eventually observing him fail to completely stop at a stop sign. On that basis, Linehan effected a traffic stop after defendant pulled into his nearby driveway and was already outside of his vehicle.
Linehan ran defendant's license and registration, which came back clean. In a subsequent discussion, defendant acknowledged that he had rolled through the intersection. Linehan questioned defendant about his curfew and his activity earlier that evening. Meanwhile, according to Linehan, Brown saw wrappers from restaurants inside defendant's vehicle, which Brown knew did not have locations near Elmira.
Defendant then gave inconsistent and dishonest answers to the police officers' questions about his whereabouts and curfew requirement. Linehan testified that he then sought defendant's consent to search the vehicle. When defendant refused, Linehan warned that he would contact defendant's parole officer who, according to Linehan, would search the vehicle pursuant to defendant's parole conditions.
The body camera video indicates that 12 minutes into the encounter, defendant admitted that he had lied to officers because of his parole status and consented to Linehan "look[ing] through" his vehicle, but then revoked that consent almost immediately. At that point, Brown pat frisked defendant for weapons, finding none; defendant fully cooperated.
Linehan testified that he requested a canine unit, but none were available. Linehan conceded that only at that point did he contact Pirozzolo. In the meantime, 19 minutes into the encounter, while Linehan was in his patrol car, defendant called his attorney and spoke to him on speakerphone. The attorney advised defendant to ask for a citation and refuse consent to search the vehicle.
Testimony established that, around 9:40 p.m., Linehan got in contact with Pirozzolo, who supervised defendant's parole officer and was off duty. Linehan testified that he called Pirozzolo to "relay my concerns and relay the information that we had to see how the parole officer wanted to proceed." Linehan informed Pirozzolo of "all the particulars" at the traffic stop up to that point, as outlined above.
Pirozzolo testified that he did not approve a travel request from defendant, which, as a senior parole officer, would have been his responsibility. Because he also knew that defendant's curfew was no later than 9:00 p.m., Linehan's stop of defendant at 9:20 p.m. meant that defendant had also violated curfew. He decided to respond to the scene "for further investigation" based upon the information conveyed by Linehan and defendant's active parole status.
Meanwhile, Linehan and Brown assessed [*3]defendant to be agitated and acting "squirrelly." Based on that assessment, Linehan pat frisked defendant again, while defendant continued to cooperate. This time, however, Linehan removed the contents of his pockets — including his cell phone — and placed him unshackled into the back of a patrol car to wait for Pirozzolo. Among the items confiscated from defendant was a receipt from a New York City restaurant apparently printed that day, which Linehan provided to Pirozzolo when he arrived.
Pirozzolo testified that he decided to search defendant's vehicle only upon arriving at the scene, when defendant refused to answer where he had been and after seeing the restaurant receipt from defendant's pocket. With Linehan and Brown watching, Pirozzolo conducted a warrantless search of defendant's vehicle, observing more wrappers from nonlocal restaurants. Eventually, Pirozzolo found a closed shoebox on the floor behind the front passenger seat. Upon opening the box and removing tissue paper, he discovered the subject heroin. Pirozzolo ceased his search, and the vehicle was impounded, after which Linehan searched the vehicle again, removing the heroin and, among other things, what appeared to be receipts of large financial transactions.
Given this background, we turn to defendant's challenge to the traffic stop. There is no dispute that, at its inception, defendant's traffic stop was justified by his failure to heed a stop sign (see People v Blandford, 190 AD3d 1033, 1035 [3d Dept 2021], affd 37 NY3d 1062 [2021], cert denied ___ US ___, 142 S Ct 1382 [2022]; People v Blanche, 183 AD3d 1196, 1198 [3d Dept 2020], lv denied 35 NY3d 1064 [2020]). At issue is whether "the seizure [was] reasonably related in scope, including its length, to the circumstances which justified the detention in the first instance" (People v Blanche, 183 AD3d at 1198 [internal quotation marks and citation omitted]). To extend a stop beyond its original purpose, circumstances must arise that "furnish the [officer] with a founded suspicion that criminal activity is afoot" (People v Banks, 148 AD3d 1359, 1360 [3d Dept 2017] [internal quotation marks and citation omitted]). In this regard, it is highly relevant that the officers were both aware of defendant's parolee status and the prospect that he had violated parole by leaving the county and staying out beyond his curfew (see People v McMillan, 29 NY3d 145, 148-149 [2017]; People v Huntley, 43 NY2d 175, 181 [1977]).
Defendant's multiple and inconsistent explanations about his travels, which the police officers knew were false, coupled with his parole situation and his nervous demeanor throughout the encounter, combined to give the officers a founded suspicion of criminality (see People v Banks, 148 AD3d at 1362). As such, the police officers were authorized to extend the scope of the stop beyond its original justification by requesting consent to search defendant's vehicle and, upon denial, detaining defendant to await a canine sniff [*4]of the vehicle's exterior (see People v Blandford, 190 AD3d at 1036).
The difficulty that the police officers encountered is that they learned 25 to 30 minutes into the stop that the canine unit was unavailable. At that point, the police officers were permitted to continue a common-law inquiry (see People v Garcia, 20 NY3d 317, 322 [2012]), taking due account of the fact that the potential parole violations were not criminal in nature (see Executive Law § 259 [6], [7]). In that context, we agree with County Court that Linehan's decision to speak with defendant's parole officer was within reason. By his account, Pirozzolo confirmed that defendant had violated two parole conditions, so he decided to go to the scene "for further investigation" — a decision that was certainly within the scope of his duties. It was also reasonable for the police officers to detain defendant pending Pirozzolo's arrival (see People v Porter, 101 AD3d 44, 45-46 [3d Dept 2012], lv denied 20 NY3d 1064 [2013]), and there is no indication in the record that Pirozzolo unduly delayed in coming to the scene.[FN1] When he arrived, defendant was still sitting in the patrol car. Pirozzolo explained that he intended to ask defendant "questions about where he had been," but defendant responded, "I'm not going to answer any questions. You can send me back to jail now."
At that juncture, Pirozzolo decided to search the vehicle "under [the parole office's] general rules and conditions of release," which usually require parolees to submit to warrantless searches by their parole officers (see People v Walker, 80 AD3d 793, 794 [3d Dept 2011]). Even absent this requirement, a parole officer's search "is constitutional if the conduct of the parole officer was rationally and reasonably related to the performance of the parole officer's duty and was substantially related to the performance of duty in the particular circumstances" (People v Wade, 172 AD3d 1644, 1644 [3d Dept 2019] [internal quotation marks, ellipsis, brackets and citation omitted], lv denied 33 NY3d 1109 [2019]). Importantly, a parole officer's duty includes an "'obligation to detect and to prevent parole violations for the protection of the public from the commission of further crimes'" (id. at 1645, quoting People v Huntley, 43 NY2d at 181). Given that defendant was placed on lifetime parole in 1999 due to illegal narcotics activity, we conclude that Pirozzolo's decision to search the vehicle was reasonable and substantially related to the performance of his duties (see People v Ramos-Carrasquillo, 197 AD3d 1000, 1001 [4th Dept 2021], lv denied 37 NY3d 1164 [2022]; People v Wade, 172 AD3d at 1644-1645; People v Sapp, 147 AD3d 1532, 1533 [4th Dept 2017], lv denied 29 NY3d 1086 [2017]; People v Candelaria, 63 AD2d at 89-91). We are mindful that the police officers believed that a search of the vehicle was warranted, and Pirozzolo's presence at the incident is fairly traceable to that belief. However, deferring to County Court's [*5]assessment of Pirozzolo's credibility (see People v Sanchez, 196 AD3d 1010, 1013 [3d Dept 2021], lv denied 37 NY3d 1029 [2021]), we conclude that Pirozzolo's search of defendant's vehicle was the product of his independent assessment of the facts known to him at that time (compare People v Smith, 202 AD3d 1492, 1495 [4th Dept 2022]). As such, County Court properly denied defendant's suppression motion.
We further conclude that County Court did not abuse its discretion in denying defendant's CPL 440.10 motion without a hearing. Defendant claims, essentially, that Linehan's dashcam video could have been used as impeachment evidence at the suppression hearing and supported a finding that Pirozzolo's search was unlawful, and the People's failure to produce that video works a Brady violation. "A Brady violation requires, among other things, a showing that the People suppressed the evidence at issue" (People v Seeber, 94 AD3d 1335, 1336 [3d Dept 2012] [citation omitted]; see People v Lalonde, 160 AD3d 1020, 1026 [3d Dept 2018], lv denied 31 NY3d 1118 [2018]). Linehan confirmed that his patrol vehicle's dashcam was designed to begin recording when the emergency lights were activated. Linehan activated those lights when he initiated the stop at defendant's driveway, and the lights remained on throughout the stop. Linehan, however, could not explain EPD's protocol for preserving a dashcam video. In response to County Court's directive, the chief assistant district attorney requested and received a written explanation from a lieutenant in EPD advising that he "did check the Digital Ally video manager for video for this case which was meet [sic] with negative results."
Defendant's allegation that the video was suppressed by the People is speculative and refuted by the record (see People v Miles, 205 AD3d 1222, 1224 [3d Dept 2022], lv denied 38 NY3d 1189 [2022]; People v Thomas, 38 AD3d 1134, 1136-1137 [3d Dept 2007], lv denied 9 NY3d 852 [2007]). The documents submitted by defendant detailing EPD's dashcam video preservation policy do not raise questions of material fact in this regard, and the averments contained in defendant's own affidavit were insufficient to warrant a hearing (see People v See, 206 AD3d 1153, 1156 [3d Dept 2022]; People v Brandon, 133 AD3d 901, 903 [3d Dept 2015], lv denied 27 NY3d 992 [2016]).
Egan Jr., J.P. and Pritzker, J., concur.
Aarons, J. (dissenting).
We disagree with the majority's determination that County Court correctly denied defendant's suppression motion. In our view, the police officer who conducted the traffic stop did not have founded suspicion that criminality was afoot and, therefore, defendant was detained beyond what was reasonable under the circumstances. Accordingly, we respectfully dissent.
"A traffic stop constitutes a limited seizure of a vehicle's occupants and, for such a stop 'to pass constitutional muster, the officer's action in stopping the vehicle must be justified at its inception and the seizure [*6]must be reasonably related in scope, including its length, to the circumstances which justified the detention in the first instance'" (People v Blanche, 183 AD3d 1196, 1198 [3d Dept 2020], lv denied 35 NY3d 1064 [2020] [citations omitted], quoting People v Banks, 85 NY2d 558, 562 [1995], cert denied 516 US 868 [1995]). The record reflects that Edward Linehan, a police officer with the Elmira Police Department, observed defendant roll through a stop sign. Linehan activated his emergency lights and effectuated a traffic stop. Linehan told defendant that he saw him roll through a stop sign and, according to Linehan, defendant admitted to him that he had done so. Linehan then asked defendant for his driver's license and registration. Linehan ran defendant's information, which revealed that defendant's driving privileges were valid. In our view, once Linehan confirmed that there was nothing wrong with defendant's license or registration, all that remained at this point was for Linehan to issue a citation to defendant, which Linehan admitted he had sufficient information to do (see People v Milaski, 62 NY2d 147, 156 [1984]; People v Barreras, 253 AD2d 369, 373 [1st Dept 1998]).
Notwithstanding the foregoing, Linehan testified that, after processing defendant's information, he engaged defendant further and asked him about his whereabouts. Defendant did give conflicting answers in response to Linehan's inquiry, and County Court found that such answers, coupled with defendant's nervous demeanor and parole status, gave Linehan founded suspicion that criminality was afoot. These answers and behavior by defendant, however, came after the initial justification for stopping and detaining defendant had already dissipated (see People v Banks, 85 NY2d at 562). Indeed, between the time when Linehan effectuated the traffic stop and processed defendant's license and registration, Linehan did not observe anything suspicious by defendant so as to give him founded suspicion that criminality was afoot in order to continue defendant's detention (compare People v Medina, 209 AD3d 1059, 1061-1062 [3d Dept 2022]; People v Noonan, 220 AD2d 811, 812 [3d Dept 1995]).
In other words, any false or conflicting information given by defendant to Linehan about his whereabouts could not form the basis of any founded suspicion that criminality was afoot. Accordingly, the drugs, which were discovered in defendant's car after Linehan processed defendant's license and registration, should have been suppressed (see People v Betsey-Jones, 203 AD3d 1688, 1689 [4th Dept 2022]).
McShan, J., concurs.
ORDERED that the judgment and the order are affirmed.

Footnotes

Footnote 1: Defendant makes no claim that the police officers lacked authority to place defendant in the patrol car or remove his property.